## No. 2350.

## Lew May v. The State.

1. PRACTICE—CONTINUANCE.—In view of the fact that all of the witnesses, save one, named in the application for continuance were either present or accessible at the time of the trial, and either testified, or could have been called to testify, and that the trial court offered to postpone the trial until the arrival of the absent witness, which offer was declined by the defense, the ruling of the trial court refusing the continuance was correct.

2. SAME—EVIDENCE—BILL OF EXCEPTION to the refusal of the trial court to permit the defense to ask a given question of a witness is not sufficient to bring the action of that court in review, unless it discloses the purpose of the question or the answer expected to be elicited thereby.

3. MURDER—FACT CASE.—See the statement of the case for evidence held sufficient to support a capital conviction for murder.

APPEAL from the Criminal District Court of Harris. Tried below before the Hon. Gustav Cook.

The indictment in this case was presented by the grand jury of Harris county, Texas, to the criminal district court of Harris county, on the fourteenth day of October, 1887. It charged the appellant with the murder of Clarence Phillips, alleging that

of his express malice aforethought the accused, on the fifth day of July, 1887, in Montgomery county, Texas, did shoot the said Phillips with a pistol, and that the said Phillips thereafter, on the sixteenth day of said July, in the said county of Harris, of the said pistol shot wound, did die. The death penalty was assessed against the appellant.

Doctor J. M. Boyles was the first witness for the State. He testified that he was one of the physicians in charge of the city infirmary of Houston. Clarence Phillips was brought to that infirmary on July 5, 1887, from which time until his death, on July 16, 1887, the witness knew him. The said Phillips, when he was brought to the infirmary, was suffering from a gun shot wound through the head, and that wound was the cause of his death on the sixteenth day of the same month. The ball entered the forehead at the junction of the nasal and the frontal bones, and passed through the ethenoid bone and brain substance, but did not make its exit from the skull. Phillips was unconscious from the time he was placed in the infirmary until his death, except at rare intervals of brief duration, during which he appeared to recognize his acquaintances. He received every attention while at the infirmary, being treated by the witness and Doctors T. J. Boyles, Stuart and Red. The wound in the head of Clarence Phillips was necessarily fatal, and terminated in his death on July 16, 1887.

On his cross examination, the witness stated that patients had been known to recover from the effect of gun shot wounds in the brain, but the instances of such recovery were very rare. The best treatment for cases of brain wounds was to keep the patient perfectly quiet. Phillips was brought to the infirmary on a railroad train. Witness could not say that his travel on the cars for a distance of thirty or forty miles, after being shot through the brain, injured him, or impaired his chances of recovery. The infirmary was supplied with all the conveniences and surgical instruments necessary for the treatment of gun shot wounds, but witness could not say that it was supplied with all that were known to medical science. No effort was made to remove the ball from Phillips's head, as it was imbedded in the brain. An operation to remove the ball would have been attended with great danger. The skull was not trepanned for the ball. Such an operation was a very delicate one, resulting often in producing the immediate death of the subject, and, besides, the surgeons in this case could not locate the exact position of the

foreign substance in the brain, and hence could not know at what point of the skull to perform the operation. Trepanning, even when the exact position of the foreign substance is accurately known, results, in a great majority of cases, in bringing about the speedy death of the subject. Doctor Rutherford did not advise the trepanning operation in Phillips's case, nor did he proffer to assist in performing it.

J. D. Wentzell testified, for the State, that he attended a party at the house of Richard Norris, near Presswood, in Montgomery county, Texas, on the night of July 4 and morning of July 5, 1887. Defendant and Clarence Phillips and the latter's wife were also in attendance. Witness played the fiddle for the dancers on that night and morning. Everything progressed pleasantly until about three o'clock on the morning of July 5, when, on account of some little disturbance by somebody other than the defendant, the witness quit playing. Defendant then stepped up to witness and said to him: "You can take your d—d old fiddle and go to hell with it; you are in the habit of breaking up parties in that way." Defendant then left witness and said nothing more to him until witness accosted him and asked him why he spoke to him in the manner he did. Defendant replied that he did it as a joke. Witness then resumed playing and played the fiddle for the party until daybreak, when he started home, bidding defendant good bye. Clarence Phillips and witness left the party together, and went together as far as Norris's gate, where the witness stopped, Phillips going on. About this time defendant came up to witness and said to him: "Jeff, I don't want you to think, because I made apologies a while ago, that I am afraid of you." He then drew his pistol, covered the witness with it and said to him: "You d—d son of a bitch, I will take the fiddle and cut it to pieces." About that time Mrs. Phillips, the wife of Clarence, came up, and as she was passing through the gate, defendant said to her: "I have your fiddle, and I would like to see any of your friends get it. I am going to cut it in pieces." Mrs. Phillips made no reply, but went on. Clarence Phillips then appeared on the scene, and defendant said to him that he was going to cut the fiddle to pieces. Clarence replied that the fiddle belonged to him and his wife. Defendant replied to him: "You can't get it, nor can any of your d—d friends." Phillips replied that he would have the fiddle. Defendant then covered Phillips with his pistol, and said to him: "I will shoot the heart out of you before you shall

have it, you d—d son of a bitch." Phillips then said to defendant: "Lew, I am unarmed, and I hate for a man to take advantage of me in that way." The defendant replied: "I won't shoot you; you are too brave a man to be killed; so go off, arm yourself and come back and settle it with me." Phillips then asked defendant: "If you do not intend to shoot, why do you keep your pistol drawn on me? You know I won't take your language from any man, you d—d rascal." The defendant thereupon stepped back, fired, and shot Phillips between the eyes. Phillips fell to the ground, and defendant cocked his pistol to fire again, when witness appealed to him to desist. Defendant thereupon turned towards the witness and fired a shot into the air and walked off, and witness did not see him again. Witness could not remember that any person but Jimmy Vick, besides himself, was present at the time of the shooting. Clarence Phillips was shot near Presswood, in Montgomery county, Texas, just after daylight on the morning of July 5, 1887, and was placed on the train and taken to the infirmary at Houston on the same day.

Cross examined, the witness said that he was now residing at the house of Mrs. Phillips, and had been residing there for several months before the shooting of Clarence Phillips. He was in the employ of Clarence Phillips at the time of the shooting. The fiddle which was played by the witness that night, and which was the apparent *casus belli* of the difficulty, was the property of Clarence and Mrs. Phillips. It was taken to the dance by the witness. Upon starting from home to the dance on the night before the shooting, Clarence Phillips told his wife to get a bottle of whisky and take it along; which she did. Neither the witness nor Clarence Phillips took any whisky to the party. Witness did not know that all of the whisky that was at the party was taken there by Mrs. Phillips. He knew of but one bottle of whisky being taken from Phillips's house. Phillips and defendant drank together several times during the night, but neither of them was drunk. Witness himself drank with Phillips and defendant from the bottle which was taken to the party by Mrs. Phillips. No disturbance of any kind occurred at the party until three o'clock in the morning, and defendant and Phillips appeared to be on friendly terms throughout the night. Witness did not tell Phillips what the defendant said to him at three o'clock about the fiddle. There was no understanding or agreement between witness and Phillips to provoke a difficulty

with the defendant on that night. Witness had no reason to and did not anticipate a row of any kind. The party had broken up, and the guests had started home when the shooting occurred. Defendant did not put up his pistol from the time that he first drew it on the witness until he shot Phillips. The witness had no quarrel at the gate with defendant before defendant drew his pistol and took the fiddle away from him. Witness was unarmed, and, so far as he knew, Phillips was also unarmed.

James Vick testified, for the State, that he was present at the party at Richard Norris's house, near Presswood, Montgomery county, on the morning of July 5, 1887, and witnessed the shooting of Clarence Phillips by the defendant. The shooting occurred just after day light, and just after the party had broken up and while the guests were going home. It occurred at a point just outside of Norris's gate, and between the gate and the railroad track. When witness started towards the gate on his way home, he saw Phillips going towards Peterson's house, just across the railway from Norris's gate, and about fifty yards distant. Wentzell was then standing at the gate. Just as witness was going through the gate, defendant drew his pistol on Wentzell, took Mrs. Phillips's fiddle from Wentzell's hand and said to him: "You d—d son of a bitch, I am going to cut this fiddle to pieces." About this time Clarence Phillips came back to Norris's gate from Peterson's house, and defendant said to him: "I have got your fiddle, and I am going to cut it to pieces. You can't get it, you nor none of your d—d friends." Phillips replied that he was going to have his fiddle, when defendant covered Phillips with his pistol and said to him: "I will shoot your d—d heart out before you shall have it." Phillips replied: "You have the advantage of me; I am unarmed or I would not take this." Defendant then said: "I am too brave a man to shoot you," and dropped his hand with the pistol to his side. He was then holding the pistol in his right, and the fiddle in his left hand. Witness could not see defendant's right hand after he dropped it to his side, and could not say whether or not he put his pistol in his pocket. Phillips then advanced two steps towards defendant, stopped and said to him: "Shoot my heart out, you d—d scoundrel. You are too d—d big a coward to shoot." Phillips's hands were then at his sides. Defendant took two steps out of the path as Phillips stepped forward. Phillips then said: "You d—d rascal, I can't take that!" Thereupon defendant raised his pistol and fired, shooting Phil-

lips in the forehead. Phillips fell, and defendant walked across the railroad to Peterson's house, and witness left the scene. Phillips, when shot, was standing still with his hands hanging down by his side.

Cross examined, the witness stated that, just before the party broke up, he saw the defendant, Phillips and Wentzell together in a room, taking a drink. Something was said at that time about defendant's hat being lost. Phillips and Wentzell left the house first, Phillips going on to Peterson's house, and Wentzell stopping at the gate. Witness then went into the room in which the parties named had just drank, and defendant left it, going as far as the gate. Witness then heard loud talking at the gate between defendant and Wentzell. Judging from the voices of the two men, they were both excited, but witness could not distinguish what was said by either of them. Witness then left the room, and, as he approached the gate, the defendant drew his pistol on Wentzell, took the fiddle and made the remark stated by witness on his direct examination. Wentzell quit playing the fiddle about three o'clock on the morning of the fifth, but soon recommenced, and played until the party broke up. Nothing of an unpleasant nature occurred that the witness observed, and if there was any understanding between Wentzell and Phillips to provoke a difficulty with defendant during that night, the witness did not know it. Witness knew of no trouble between defendant and Phillips on that night, prior to the shooting. The witness did not think that the fatal shot would have been fired had not Phillips made the remark to defendant stated by witness on his direct examination, after defendant dropped his pistol to his side with the remark that he was too brave a man to shoot Phillips as they were then situated. On his re-examination the witness said that Phillips was not advancing upon the defendant, nor was he making any hostile demonstrations at the time he was shot. Phillips was a stout and athletic man, the defendant a smaller and weaker man.

Mrs. Sarah Phillips was the next witness for the State. She testified that she was the widow of Clarence Phillips, deceased. She attended the dance at Norris's house on the night of July 4, 1887. She started home on the morning of July 5, after the party broke up. She had gone, perhaps, seventy-five yards up the railroad track when the fatal shot was fired. As the witness passed defendant and Wentzell at the gate, the defendant had her fiddle in one hand and his pistol in the other, covering

Wentzell with the pistol. He said to witness as she passed through the gate: "I have your fiddle, and neither you nor your friends can get it." Witness made no reply, but went on towards home. She was not looking back at the time of the shooting, or she would have seen it, as the gate could be seen from the point where she was when the shot was fired. Witness and her little daughter, who was with her, went back to the gate after she heard the shooting, and found her husband lying on the ground. While she was stooping over her husband's prostrate body the defendant returned from Peterson's house with a shot gun, and said to witness: "D—n you, if you don't leave here I'll shoot your d—d heart out, and your d—d kid's, too!" Witness, fearing that defendant would execute his threat, left her prostrate husband and went into Norris's yard. From there she went to Mr. Cooper's house and remained until defendant left the vicinity. Witness then went back to her husband, stayed with him until he was placed on the train and taken to the infirmary at Houston, accompanied him to Houston, and remained with him until his death. No person remained with witness's husband after he was shot, but everybody who was at the party left, and he lay where he fell, attended by no one except the witness, until just before he was taken to Houston. Witness's husband had no pistol on his person that night.

Mr. Cooper testified, for the State, that he attended the party at Norris's on the night of July 4, 1887, but left about two o'clock next morning, up to which time no disturbance of any kind had occurred. Defendant came to witness's house about twenty-four hours after the shooting, which was before his arrest. He said, in the course of the conversation about the shooting, that he was sorry for Phillips's mother, but was not sorry for Phillips; that if it was to be done over again, he would do it, but would do it better; that he did not know until noon on that day that Phillips was not dead, and that if he had known it in time he would have gone back and finished him. Witness was friendly to both defendant and Phillips. He had taken no part in this prosecution, and felt no further interest in it than to see justice done and truth prevail.

The State rested.

Terry Presswood was the first witness for the defense. He testified that he attended the dance at Norris's house on the night of July 4, 1887. During the night witness and Phillips went into the yard together, and took a drink from a bottle that

Phillips produced.  While standing in the corner of the yard, after taking the drink, Phillips drew a pistol from his clothes, showed it to the witness, and said that he brought it to the party for the purpose of killing Lew May before daylight.  He then asked witness if he, witness, had any cartridges.  Witness replied in the negative, when he repeated the question and felt of the witness's vest pocket.  Witness told him again that he had no cartridges, when Phillips produced four from his pocket and remarked that it made no difference, as he had some.  He dropped one of the cartridges, which witness picked up and offered to him.  He said that three were enough, and that witness could keep the fourth.  He then put three cartridges in his pistol and returned his pistol to his pocket.  When witness went back into the house he whispered to defendant, telling him what Phillips had said and done.  He did so because he did not want any trouble to arise, and he knew that Phillips, when drinking, was a dangerous man.  On his cross examination the witness said that it was early in the night when Phillips exhibited the pistol to him and made the threats stated.  He did not see defendant and Phillips take a drink together after Phillips exhibited the pistol to him.  No conversation took place between witness and Phillips prior to the one in which Phillips exhibited the pistol and said that he was going to kill defendant before daylight.  Witness and Phillips were not enemies at the time of the shooting.  It was true that witness's father and Phillips were not then friends, but that fact did not influence the witness.  A man named Smith, who lived in Montgomery county, came up to witness and Phillips during the conversation in the yard, and while Phillips was drinking and showing his pistol.  That man was not a friend of the witness.  He and witness had a fight not long before this trial.  Witness did not know why Smith came to where he and Phillips were unless he hoped he would be offered a drink.  Witness had told a straight story about Phillips's pistol, and did not want to be asked any more questions about it.  So far as the witness knew, Phillips made no attempt to shoot defendant on the night of the dance.  Everybody left Norris's in a hurry after the shooting of Phillips.  Wentzell ran away faster than anybody else.  Witness could not say why no person went to Phillips's assistance.  He did not know that they were afraid of defendant.

Doctor R. Rutherford testified, for the defense, that trepanning was a surgical process for the removal of foreign substances

from the brain. That process would result successfully in not more than one out of a thousand operations. Witness did not advise trepanning in the Phillips case, nor did he offer to assist in performing the operation. Gun shot wounds in the brain were generally fatal. The foreign substance in the brain could be located by the part of the body paralyzed. No remedy, other than trepanning, was known for a gun shot wound in the brain; and that operation, though occasionally successful, was fatal in a vast majority of cases.

Mr. Presswood, the father of the witness Terry Presswood, testified, for the defense, that he was well acquainted with Clarence Phillips, and knew that he sustained the reputation of being a violent and dangerous man when drinking, and one likely to execute a threat. Witness and Phillips had a misunderstanding once, and were not friends, though they spoke in passing. That fact, however, would not influence witness to testify falsely about Phillips. The witness was also acquainted with the reputation of the witness Wentzell for truth and veracity. It was bad, and from witness's knowledge of that reputation, witness would not believe Wentzell on oath.

Richard Norris testified, for the defense, that the party at which the fatal shooting took place was had at his house, near Presswood, in Montgomery county. His house fronted the railway right of way, about fifty feet from it. Peterson's house was just across that right of way, opposite and about fifty yards distant from witness's house. The route from witness's to Phillips's house lay with the railway track, west. About the time that the party broke up, on the morning of July 5, the witness, who was in the back part of his house, heard loud talking at his front gate. He went into the front room, and found his lady guests very much excited and frightened. He attempted to pacify them, and about that time he looked out and saw defendant and Phillips at the gate, defendant retreating and Phillips advancing on him. Defendant retreated as far as a pile of logs, beyond which he could not go, Phillips still advancing. Defendant fired and Phillips fell, about midway between witness's fence and the railway track. Defendant, who then had the fiddle in his left hand, upon the fall of Phillips went to Peterson's house. He did not, so far as the witness saw or heard, return to the body of Clarence Phillips. Witness did not see Mrs. Phillips near the body of Phillips after the shooting, and thought that, if Mrs. Phillips came to the body at all, he would have seen her; or, if

defendant ordered her to leave the body, that he would have heard him.

Cross examined, the witness said that Phillips and defendant were both friends of his. If there was any disturbance at the party prior to the shooting, witness did not know it. He did not know that a single guest of his was armed. He did not go to Phillips's body after the shooting. He remained in the house to pacify the ladies, and about thirty minutes after the shooting he and his wife left home through the back gate of his yard and went to the house of his cousin, leaving Phillips where he fell. Mrs. Blount was the only person, so far as witness knew, who went to Phillips's body. Witness knew only by hearsay that Phillips's body was moved to his house after he left. Witness could not say that the reason nobody went to Phillips after the shooting was because they were afraid of defendant. Nor could he say that the same reason prevented people from attending to Phillips. Mrs. Phillips left the witness's house at the same time and by the same gate that witness did, but went off in another direction than that taken by the witness. Witness was standing in the hallway of his house, looking out, at the time of the shooting, and could and did see all that occurred. Mrs. Phillips was then some distance up the railway track, going towards her house.

Mr. Peterson, who lived opposite and near Norris's house, testified, for the defense, that, soon after the shooting of Phillips, the defendant came to his house and demanded his gun. He remained at witness's house for some time, but did not go back to where Phillips was lying, nor did Mrs. Phillips go back to her husband after he fell. On cross examination, the witness said that, when defendant demanded his gun, he declined to let him have it, but he took it, notwithstanding the witness's objection, saying that he was apprehensive of being mobbed. The people at Norris's party ran off as soon as the shooting occurred. Phillips lay where he fell, in front of Norris's gate, for an hour and a half before anybody went to him. He was then taken into Norris's house.

Mr. Enloe and Mr. J. M. Bowen, the latter a justice of the peace, testified, for the defense, that, to their knowledge, the reputation of Phillips was that of a violent, turbulent and dangerous man, when drinking. The reputation of the State's witness, Wentzell, for truth and veracity was bad. Bowen further testified that defendant surrendered to him, and he delivered

defendant to Mr. Simonton, sheriff of Montgomery county. On his cross examination he stated that he and a constable started out to arrest defendant after the shooting. As they approached the house in which defendant was said to be at that time they were warned by a man they met on the road not to go to the house, as defendant would shoot them. It was not true that Sheriff Ellis, of Harris county, and his deputy, Albert Erichson, arrested defendant. Defendant was not placed in custody until the third day after the shooting, when he surrendered to witness and was turned over to the sheriff of Montgomery county by witness.

Mrs. Roberts testified, that 'she reached the dance at Norris's house between ten and eleven o'clock on the night of the shooting. Soon after she got into the house, defendant told her that Phillips was drinking, and had been trying for some time to get him to leave the house for private talks, and had endeavored to "raise a row" with him; and that he did not want to have a difficulty with Phillips, and therefore had not left the house with him. The witness was not related to either defendant or Phillips.

Several witnessess for the defense testified that the general reputation of Phillips was that, when drinking, he was a violent, turbulent and dangerous man, well calculated to execute a threat.

The defense closed.

Alexander and Albert Erichson and S. S. Ashe testified for the State, in rebuttal, that they had each known Clarence Phillips for twenty years, during which period he sustained the reputation of being a peaceable, law abiding citizen. Neither of said witnesses had ever known said Phillips to wear a pistol. Albert Erichson testified, further, that he and sheriff Ellis arrested defendant in Montgomery county, Texas, and that J. M. Bowen had nothing to do with said arrest.

D. A. McKinney and Reed Singleton testified, for the State, in rebuttal, that they had each known the States' witness Wentzell, for a number of years. They knew his general reputation for truth and veracity in the community in which he lived. It was good.

Sheriff Ellis testified, for the State, in rebuttal, that he and his deputy, Erichson, went to the "Big Thicket" in Montgomery county and arrested defendant. The arrest was made in this way: They met Bowen and had some conversation with him

about their purpose to arrest defendant. Bowen said that he would go after defendant. He left and soon returned with defendant, when witness and Erichson arrested him. On the same day witness, with his prisoner, met Sheriff Simonton and offered to surrender defendant to him. It was finally determined to take defendant to Houston for safe keeping.

The motion for new trial raised the questions discussed in the opinion.

No brief for the appellant.

*W. L. Davidson,* Assistant Attorney General, for the State.

WILLSON, JUDGE. I. It was not error to refuse to grant defendant's application for a continuance. P. S. Humble, one of the witnesses for whose testimony the continuance was sought, testified on the trial in behalf of the defendant. William McFadden, another one of said witnesses, was present before the testimony on the trial was concluded, and the defendant declined to place him upon the witness stand. Irene May, another of said witnesses, was on the way to attend the trial, having been attached as a witness in behalf of the defendant, and the court offered to postpone the trial to await her arrival, but the defendant waived such postponement. As to the testimony of the other witnesses named in said application, it could not be regarded as material, in view of the evidence adduced on the trial; and, furthermore, it appears that said other witnesses also made their appearance in court, and that the defendant, although having the opportunity to do so, did not place them upon the witness stand. Other grounds set forth in the application are not legal ones, and were addressed to the discretion of the court, and, in our judgment, the application was without merit, either legal or equitable, and the defendant has suffered no injury by its refusal.

II. Defendant's second bill of exceptions discloses no error injurious to his rights. It complains that a certain question, which was propounded by defendant's counsel to the witness Enloe, the court, upon objection made by the State, would not allow to be answered. It is not shown by the bill what answer would have been made to said question by said witness, or what answer defendant expected thereto from said witness. We can not know or presume that the answer to said question would

have been at all material or in any way beneficial to the defendant. The bill furthermore states no object or purpose to be attained by the question and answer thereto. (Hennessey v. The State, 23 Texas Ct. App., 340; Walker v. The State, 19 Texas Ct. App., 176; Counts v. The State, Id., 450 ; Davis v. The State, 14 Texas Ct. App., 645; Guajardo v. The State, 24 Texas Ct. App., 603.)

III. There is no merit in any of the exceptions made to the charge of the court. The charge is plain, concise, applicable to the evidence, and in all respects correct and fair to the defendant. The two special instructions requested by the defendant were not demanded or even warranted by the evidence, and were properly refused.

IV. We can perceive no error in the action of the court overruling defendant's motion for a new trial. Without discussing in detail the various grounds of said motion, we will say that each of them has had our careful consideration. Some of the grounds are unsustained and contradicted by the record, and none of them would, in our opinion, justify this court in disturbing the conviction. That the evidence warrants and confirms the conviction, and justifies the extreme penalty assessed, we have no doubt. The evidence proves that the homicide was deliberately and sedately committed by the defendant, with a formed design to take the life of the deceased. There is ample evidence proving express malice on his part. There is no evidence showing justification, excuse or mitigation. It is, upon the evidence, a clear case of murder in the first degree, unaccompanied by the slightest extenuating fact.

The judgment is affirmed.

*Affirmed.*